# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 15 CR 703 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| JORGE LLUFRIO, ) | |
| also known as "Cuba," ) | |
| ) | |

## OPINION AND ORDER

Alone in a Federal Bureau of Investigation ("FBI") interview room, Defendant Jorge Llufrio, recently arrested in a drug conspiracy investigation, began to talk to himself. Looking up, he thought he saw a camera hidden in the ceiling, but he continued to whisper to himself in Spanish. Llufrio was looking in the wrong place, but his instincts were right—after the FBI had placed Llufrio in the interview room, it started secretly recording the sights and sounds in the room. The Government previously turned over the audio and video recordings in its conspiracy case against Llufrio, and, after producing a certified translation of Llufrio's statements, the Government now moves to admit the recorded statements. Because Llufrio, in opposing the motion, demonstrates that he had a legitimate expectation of privacy in the statements, the Court denies the Government's motion and bars the recorded statements from admission at trial.

## BACKGROUND[1]

The Government charges in an indictment that Llufrio conspired with codefendant Sergio Fuente and cooperating witness Ismael Bustamante to possess and distribute narcotics, alleging that Bustamante procured approximately 10 kilograms of cocaine and heroin, planned with

---

[1] The facts in this background section are taken from the parties' briefs and a transcription of Llufrio's recorded statements. The Court has not identified any material disagreement between the parties as to the facts.

Fuentes to transport the drugs, and recruited Llufrio to be their driver and that Llufrio and other defendants then did possess the drugs. Bustamante and Fuentes allegedly hid the drugs in the cab of a semi-truck tractor, and while Llufrio was driving the truck to Chicago, the authorities stopped and arrested him.

After Llufrio's arrest, the FBI took him to their Chicago office, and Llufrio found himself sitting alone in a FBI interview room, which secretly could record video and audio. There was not a sign that "warn[ed] that there were cameras" and FBI agents never told Llufrio whether they were recording him. Doc. 100 at 2 n.3. After FBI agents placed Llufrio alone in the room, they began recording at 5:24 p.m., and Llufrio began talking to himself around 5:25 p.m. *See* Doc. 100-1 (cover page noting date, time, and duration of transcribed recordings).

Llufrio was already sitting in the interview room when the FBI began recording.[2] Shortly after, Llufrio began mumbling to himself and encouraging himself that things were going to work out. Through unintelligible speech and mumbling, Llufrio provided himself with self-encouragement.[3] After approximately ten minutes, Llufrio looked up, saw something, pointed, and exclaimed, "That's a f***ing camera for recording." Doc. 100-1 at 1. Llufrio continued mumbling, whispering, and looked up at what he thought was the camera at least once more.

At approximately 6:00 p.m., two FBI agents entered the room, introducing themselves and engaging Llufrio in conversation about whether he wanted an attorney. After both agents departed the room following Llufrio's request for an attorney, he resumed faintly speaking to himself. The FBI agents then reentered the room and spoke to Llufrio about inventoried items

---

[2] The Court notes that the parties have not provided the video or audio to the Court.

[3] Llufrio may also have answered a phone call on his cellular phone and spoken to someone. *See generally* Doc. 100-1 at 1 (noting a cell phone rang).

they believed belonged to him until, at approximately 6:13 p.m., they "released [him] from the room." Doc. 100-1 at 7.

The Government provided the "relevant audio and video recordings earlier in the case and recently produced a certified Spanish translation of [Llufrio's] statements." Doc. 100 at 2. Llufrio has hired an independent Spanish translator to translate the Spanish statements as recorded in the audio, but he cannot verify the Government's translated transcription because "the audio of the videotape is extremely hard to hear" and the translator needs "more sophisticated headphones to listen to the audio." Doc. 112 at 3. The Government has produced no warrant approving the recording.

**ANALYSIS**

The Fourth Amendment guards against unreasonable searches:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Electronic recordings can constitute searches under the Fourth Amendment. *See Katz v. United States*, 389 U.S. 347, 353, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (analyzing whether recording in telephone booth was an unreasonable search under the Fourth Amendment); *United States v. Webster*, 775 F.3d 897, 903 (7th Cir. 2015) (analyzing whether recording in squad car was an unreasonable search under the Fourth Amendment). The defendant must "establish that he had a reasonable expectation of privacy." *Webster*, 775 F.3d 903.[4] "A reasonable expectation of privacy exists when the defendant manifested a subjective

---

[4] "Title III, the federal wiretap law, limits the government's ability to eavesdrop on communications a person expected to keep private without a wiretap warrant" and the "legislative history of Title III indicates that the expectation of privacy it protects is intended to parallel the reasonable expectation of

3

expectation of privacy and society recognizes that expectation to be reasonable." *Id.* The "inquiry into whether a defendant's expectation of privacy was reasonable is necessarily fact dependent . . . [and] must be determined on a case-by-case basis." *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007) (internal citations omitted). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Horton v. California*, 496 U.S. 128, 133 n.4, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990) (quoting *Katz*, 389 U.S. at 357).

The Government moves to admit the recorded statements that Llufrio, while alone in the interview room, spoke to himself. Llufrio does not challenge the relevance of the recorded statements, but he argues that the Government cannot admit the recorded statements because the Government obtained them in violation of the Fourth Amendment.[5] The Government argues that Llufrio had neither a subjective nor objectively reasonable expectation of privacy, and Llufrio argues that both existed.

---

privacy test created by the Supreme Court in *Katz v. United States*." *United States v. Williams*, 15 F. Supp. 3d 821, 826–27 (N.D. Ill. 2014) (quoting *In re John Doe Trader No. One*, 894 F.2d 240, 242 (7th Cir.1990)) (internal quotation marks omitted). But Llufrio does not argue that this is a basis for objecting to using the recorded statements at trial, so the Court does not consider Title III here.

[5]  Llufrio also argues that the recorded statements contain questioning of Llufrio after he invoked his right to an attorney. The Government asserts that it does not plan to introduce any evidence of statements from Llufrio to any Government employee or official. Doc. 100 at 3 ("At this time, the government does not seek to admit any of the statements made by Llufrio in response to any questions posed by law enforcement officers during this exchange."). The Court thus does not address any statements in the recorded statements other than those Llufrio directed to himself.

Llufrio also argues that a decision on admitting the recorded statements may be premature because his own Spanish interpreter cannot confirm that the Government's proffered transcript accurately translates Llufrio's Spanish-spoken words to English. *See* Doc. 112 at 3. But Llufrio does not identify any reason why the Government's proffered transcript is inaccurate or explain the impact that any mistranslation would have on the Fourth Amendment issue raised by the parties. Until Llufrio argues that the jury cannot hear the recorded statements because it is so inaudible and indistinct as to invite speculation, there is no reason to delay addressing the Government's motion.

The Court initially notes that the Government has moved to admit the statements from the videorecording before Llufrio argued that the Court should exclude the statements. In fact, Llufrio never moved to suppress these statements. Normally, a defendant files a motion to suppress evidence; quite simply, they must do so or waive the objection to the Government's evidence. *See* Fed. R. Crim. P. 12(b)(3)(C) ("[T]he following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without trial on the merits: . . . suppression of evidence[.]"); *Id.* 12(c)(3) ("If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause."). "[A] 'motion to suppress' is any objection outside the Rules of Evidence" because "'[n]othing in the Rules of Evidence allows a court to reject relevant, inculpatory evidence seized from the defendant's home, heard during a wiretap, based on his confession, or derived from a lineup.'" *United States v. Cardena*, 842 F.3d 959, 987–88 (7th Cir. 2016) (quoting *United States v. Acox*, 595 F.3d 729, 733 (7th Cir. 2016)).

Because there is a "'line between motions to suppress, which must be made before trial, and objections, which may be made during trial,'" and because the Government's motion is not "based on the Rules of Evidence [but instead] one based on [the Fourth Amendment]," the Court treats the issue, practically, as raised by both parties prior to trial. *See id.* (quoting *Acox*, 595 F.3d at 733) (treating trial argument about the admissibility of a photo array as a suppression argument); *United States v. Barletta*, 644 F.2d 50, 55 (1st Cir. 1981) (noting in analysis of precursor to Rule 12(c)(3) that a ruling on the government's motion to admit has the "same effective force as a ruling on a motion to exclude," and that regardless of who files the motion, the motion is filed pre-trial, when possible, in order to give the government the opportunity to

5

appeal if necessary); *see also United States v. Delaema*, 583 F. Supp. 2d 104, 107 (D.D.C. 2008) (considering but denying without prejudice government motion to deny suppression before the court held a hearing on the plaintiff's motion to suppress). Although the Government provided the videorecording to Llufrio long before filing the pending motion, the Government admits that it provided the translated transcript of Llufrio's statements only recently. Further, Llufrio states that his own translator has had trouble accurately translating the recorded statements and cannot confirm that the Government's transcript is accurate. Finally, the issue crystalized before the Court at the time the Court set to consider pre-trial motions. Therefore, the Court finds that it can consider the Government's and Llufrio's arguments as to whether the Government can use the recorded statements.

Although the Government has moved to admit the recorded statements, the "defendant who objects to a search bears the burden of demonstrating that a reasonable expectation of privacy was violated by the search." *Williams*, 15 F. Supp. 3d at 826; *United States v. Best*, 255 F. Supp. 2d 905, 910 (N.D. Ind. 2003) ("Defendant bears the burden of demonstrating his legitimate expectation of privacy."). Showing an expectation of privacy requires demonstrating "an actual (subjective) expectation of privacy" and "that the expectation [is] one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring); *Webster*, 775 F.3d at 903; *Williams*, 15 F. Supp. 3d at 826–27. Therefore, because the only issue before the court is the expectation of privacy, Llufrio has the burden here.

### A. Subjective Expectation of Privacy

"The subjective prong of the expectations analysis presents a fact-specific inquiry that looks to the individual's affirmative steps to conceal and keep private whatever item was the subject of the search." *United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014) (citation

omitted) (internal quotation marks omitted) (alteration omitted). "[A]n individual claiming a subjective expectation of privacy must exhibit that expectation, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the defendant's allegedly invasive actions." *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007). "What a person knowingly exposes to the public, even in his own [domain], is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S. at 351. The Government argues that Llufrio manifested no subjective expectation of privacy because he recognized that the FBI was likely videotaping him in the interrogation room and still spoke to himself. Llufrio takes issue with the Government's characterization that Llufrio knew there was a camera in the room recording images and sound.

What did Llufrio actually say? The parties agree that Llufrio was speaking only to himself. Then, approximately ten minutes into his mutterings, as the Government puts it, "Llufrio looked in the camera's direction and said, '[t]hat's a f***ing camera for recording.'" Doc. 100 at 2 (quoting Doc. 100-1 at 1). Llufrio adds that he "looked up at the ceiling [and] mistakenly commented on what he saw." Doc. 112 at 7. What did Llufrio do? Again from the Government: "Llufrio did not attempt to hide his mouth, turn away from the camera, or stop talking to himself after [indicating his awareness of a camera]. He instead kept talking in the same low voice, essentially a whisper [after remarking about the camera]." Doc. 100 at 6. Llufrio adds facts that indicate Llufrio continued to whisper and mumble only to himself: "the audio . . . is extremely hard to hear" and requires "more sophisticated headphones to listen to the audio." Doc. 112 at 3.

The Government argues Llufrio's actions—especially what he said and then what he allowed himself to continue to say—show that "Llufrio knew he was being recorded and thus did [not] manifest an expectation of privacy." Doc. 100 at 6 (citing *United States v. Swift*, 623 F.3d 618, 623 (8th Cir. 2010)). Llufrio first contends that the Court should disregard his recognition that the FBI was likely recording him with a camera because he did not successfully identify the camera and was thus mistaken. The Court rejects this argument. That Llufrio was "tired, alone and most likely scared," Doc. 112 at 7, does not discount that he recognized the interview room very likely contained "a camera for recording." Doc. 100-1 at 1.

In *Swift*, the defendant sat in an interrogation room with another arrestee and indicated to his fellow arrestee that he "was aware that officers were able to monitor them while they were in the room and he believed officers were monitoring their conversation." *Swift*, 623 F.3d at 620. The court noted that Swift "recognized the likelihood that officers were watching him and Harlan." *Id.* at 623. In *United States v. Paxton*, No. 13 CR 103, 2014 WL 3807965, at *1–2 (N.D. Ill. July 31, 2014), the defendant, sitting in a law enforcement van, surmised out loud that the vehicle was "probably bugged," *id.* at *1–2. He then continued, "there's cameras in here too." *Id.* The Court found that the defendant extinguished any subjective expectation of privacy for any defendant in that van, even defendants who "initially took steps to conceal their conversations and exhibited a subjective expectation that they were not being overheard" because the defendant who observed that the van contained bugs and cameras put everyone "on notice that they were potentially, if not surely, under surveillance," terminating any expectation of privacy. *Id.* at *2.

Llufrio notes that "he possibly mistook [ceiling fixtures] for 'video only' type cameras frequently used in department stores," Doc. 112 at 7. Videocameras capable of recording sound

8

are now so ubiquitous that any five-year-old child would express disappointment if she or he learned that your cellular phone did not contain a camera capable of recording high-definition video and an accompanying microphone that did not simultaneously record sound. But in plain-meaning and its traditional, normal use, the word "camera" means a device that records images—a still image or a series of stills to create a moving image—not sound. *See Camera*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/camera, (last accessed February 13, 2017); *Camera*, Oxford English Dictionary, available at http://www.oed.com/view/Entry/26688?redirectedFrom=camera#eid (last accessed February 13, 2017). A camera is not a microphone, which is "an instrument whereby sound waves are caused to generate or modulate an electric current usually for the purpose of transmitting or recording sound (as speech or music). *Microphone*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/microphone (last accessed February 13, 2017); *Microphone*, Oxford English Dictionary, available at http://www.oed.com/view/Entry/118031?redirectedFrom=microphone#eid (last accessed February 13, 2017) ("1987 . . . B. Moore . . . Colour of Blood xxii. 167 . . . 'Half a dozen men and women hurried toward their car, some with cameras, some with microphones and sound equipment.'"). And a "bug," like the one described in *Paxton*, is a microphone, which can monitor conversations as law enforcement did in *Smith*. *Compare Paxton*, 2014 WL 3807965, at *1 (the arrestee declared the vehicle was "probably bugged"), *and Swift*, 623 F.3d at 620, 623 (defendant noted that law enforcement officers were "monitoring" his conversation), *with Bug*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/bug (last accessed February 13, 2017) ("a concealed listening device"). Like in *Smith* and *Paxton*, Llufrio surmised that he was being watched, destroying any expectation of privacy from

9

capturing images. Unlike in *Smith* and *Paxton*, however, there is no evidence that Llufrio thought that anyone could be listening or recording sounds in the interview room. Indeed, Llufrio commented that the FBI placed a "camera" in the room, but he did not state that he thought the FBI could hear what he was saying. Llufrio looked to the ceiling and, as the Government states, saw "several round objects protruding from the ceiling" and "mistook one of these objects for the camera." Doc. 100 at 2 n.3. The only facts before the Court suggest that Llufrio believed the FBI was monitoring with a video-only, "eye in the sky"-type camera. *See, e.g.*, *Eye in the sky*, Wikipedia, available at https://en.wikipedia.org/wiki/Eye_in_the_sky_(camera) (last accessed February 13, 2017) (discussing closed-circuit cameras for security, used in casinos and retail stores, that are enclosed in glass orbs hanging from the ceiling).

And even if Llufrio knew the FBI was recording his image, it is clear that "what [Llufrio] sought to exclude . . . was not the intruding eye—[but] the uninvited ear." *Katz*, 389 U.S. at 352. Llufrio can certainly argue that he had no subjective expectation of visual privacy but maintained an expectation of aural privacy. *See id.* ("The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been if he had remained outside. . . . He did not shed his right to do so simply because he made his calls from a place where he might be seen."); *Williams*, 15 F.3d 821, 825, 826–27 (finding that defendants possessed a subjective expectation of privacy for conversations in the back compartment of a squadrol police van that had windows and allowed "individuals in the cab compartment [to] see through the window into the back compartment . . . and vice versa"); *cf. Swift*, 623 F.3d at 620 ("Swift also made statements to Harlan which indicated Swift was aware that officers were able to monitor them while they were

in the room and he believed officers were monitoring their conversation."). Because Llufrio only takes issue with using the recorded statements at trial, not the video images, Llufrio only "must demonstrate that he sought to preserve [his statements] as private." *Yang*, 478 F.3d at 835.

"Primarily, courts have looked to considerations such as (1) the volume of the communication or conversation; (2) the proximity or potential of other individuals to overhear the conversation; (3) the potential for communications to be reported; (4) the affirmative actions taken by the speakers to shield their privacy; (5) the need for technological enhancements to hear the communications; and (6) the place or location of the oral communications as it relates to the subjective expectations of the individuals who are communicating." *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 213–15 (5th Cir. 2001) (collecting cases) (internal footnotes omitted). In *Kee*, the Fifth Circuit reviewed a civil rights claim that law enforcement officers, while investigating the alleged murder of two children by their mother, violated the privacy of the children's grieving grandmother and father by monitoring the children's memorial service with hidden microphone surveillance. *Id.* at 208–09. The Fifth Circuit noted that the grandmother and father, who bore the burden in their civil case at summary judgment to show they could prove a subjective expectation of privacy, "[did] not argue that the prayers were hushed or that their voices were modulated to protect their conversations from 'uninvited ears,' and . . . provided no information about the tone, volume, or audibility of the private communications directed toward the graves [of the children]." *Id.* at 216. The proponents of privacy also "failed to present evidence demonstrating any affirmative steps taken to preserve their privacy . . . . and fail[ed] to allege that they took any steps to ensure that unwanted individuals were excluded or that they did anything to preserve the private nature of the service." *Id.* Here, Llufrio, alone in a closed room, spoke to himself and whispered, which are certainly "reasonable safeguards or common-sense

11

precautions taken to preserve [his] expectation of privacy." *See id.* at 216–17. The Government only heard Llufrio's statements because they were secretly audio-recording the statements.

The Government contends that Llufrio should have covered his mouth, turned away from the camera, or stopped talking to himself, suggesting that Llufrio's whispering and mumbling were not sufficient safeguards to demonstrate a subjective expectation of privacy. In *Williams*, the Government contended that "lowering voices is insufficient," and the "failure to speak quietly enough" evinces a lack of subjective expectation of privacy. *Williams*, 15 F. Supp. 3d at 827.[6] "The Court disagree[d]." *Id.* As the transcription of Llufrio's statements shows, Llufrio, alone in locked room, spoke only to himself, in a manner very similar to a hushed prayer. He whispered softly enough to render a good portion of his statements inaudible, even those that the Government wants to admit. *See, e.g.*, Doc. 100-1 at 4 ("[Unintelligible] They are not going to find . . . right [Unintelligble]? [sighs and whispering]."). Llufrio's "actions indicate that [he] expected [his] conversation to go unheard and took affirmative steps to ensure as much." *Compare Williams*, 15 F. Supp. 3d at 827 (finding subjective expectation of privacy where defendant acted to keep conversation secret from law enforcement), *with Swift*, 623 F.3d at 623 (finding no expectation of privacy where the defendant recognized the likelihood that officers were watching and monitoring his conversations); *see also Kee*, 247 F.3d at 215 n.18 ("[W]hile two federal judges may have a reasonable expectation of privacy in a hushed conversation on the courthouse steps, they might lose that expectation of privacy if they spoke loudly . . . or if they failed to take any affirmative steps to shield their privacy.").

---

[6] The Government argues that the factual circumstances in *Williams* distinguish that case from Llufrio's circumstances, arguing that in *Williams*, the police led the arrestee to believe that his conversation would be private and noting in a parenthetical that the *Williams* court found a "subjective expectation of privacy in back of police squad car [squadrol] in part because 'the recording devices were deliberately hidden' by police in a hanging shirt." Doc. 100 at 6 (citing *Williams*, 15 F. Supp. 3d at 827). The Court does not find this a distinguishing factor because in *Williams*, the microphone, along with a second camera, was hidden in the squadrol's wall. *See id.* at 825.

Further, while the Court recognizes that Llufrio was inside the FBI's Chicago headquarters, other courts have recognized subjective expectations of privacy while occupying space in law enforcement property. *See, e.g.*, *Williams*, 15 F. Supp. 3d at 827 (finding subjective expectation of privacy in police squadrol); *Webster*, 775 F.3d at 903 ("We assume for purposes of the analysis here that Webster in fact manifested a subjective expectation of privacy, which was evidenced by his silencing of the conversation when the officer was in the patrol car, as would be expected from someone seeking to keep a conversation private."). Therefore, the Court finds that Llufrio has shown he had a subjective expectation of privacy for his statements.

### B. Objectively Reasonable Expectation of Privacy

The Seventh Circuit has not addressed whether there is an objective expectation of privacy in a law enforcement building's room such as the FBI's interview room here, but other courts have come to varying conclusions about whether society would accept such an expectation of privacy. *See, e.g.*, *State v. Williams*, 2013 WL 6081535, 2013-Ohio-5076, ¶¶ 32-33 (Ohio Ct. App. Nov. 18, 2013) (remarking that "[t]he majority of cases conclude there is no reasonable expectation of privacy in conversations that occur in police stations, including interrogation rooms. . . . [but] [o]ther courts have found a reasonable expectation of privacy in a police interrogation room," collecting cases); *State v. Munn*, 56 S.W.3d 486, 496 (Tenn. 2001) (without evidence that police recorded defendant's conversation with his parents in police interview room for security purposes, the defendant's expectation of privacy in his conversation was reasonable and justified). *But see Swift*, 623 F.3d at 623 ("Swift had no reasonable expectation of privacy while being detained in the interrogation room at the police station[.]"); *Williams v. Nelson*, 457 F.2d 376, 377 (9th Cir. 1972) (positing in a decision analyzing the law before *Katz*, 389 U.S. 347, that there was no expectation of privacy in a room at a police station);

13

*United States v. Colon*, 59 F. Supp. 3d 462, 467 (D. Conn. 2014) ("What matters to the expectation of privacy is not what a police car looks like inside or outside but that a suspect *knows* he is inside a police car. It is not reasonable for a suspect to believe that the inside of a police car has been reserved—like the telephone booth in *Katz*—for his benefit as a temporary sanctum for private conversations. Society would not be prepared to accept as reasonable an expectation of privacy for suspects who find themselves seated alone or with others inside a vehicle they know to be owned by the police.").

In *Swift*, the Eighth Circuit suggested a police car is analogous to a police interview room. *See Swift*, 623 F.3d at 623 (finding defendant had "no reasonable expectation of privacy while being detained in the interrogation room at the police station," immediately after reviewing suppression decision, based on rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), involving statements recorded in a police station). But the *Swift* court did not explain why there is no reasonable expectation of privacy in a police station interrogation room, instead simply declaring that this is the rule after analyzing the defendant's *Miranda* rights. *Id.*

The Seventh Circuit has addressed, however, whether society would accept an expectation of privacy in a police squad car, finding that society would not do so. *See Webster*, 775 F.3d at 903. The Seventh Circuit explained that "[g]iven the nature of [a police car] and the visible presence of electronics capable of transmitting any internal conversations, the expectation that a conversation within the vehicle is private is not an expectation that society would recognize to be reasonable." *Id.* at 904. The Seventh Circuit agreed with other circuits that "[a] squad car is in essence the mobile office of the patrol officer, and the back seat is often used as a temporary jail for housing and transporting arrestees and suspects." *Id.* at 904.

The *Webster* court noted that "the layout and equipment of the squad car" drove it to find that an arrestee had no objective expectation of privacy in the car. *Id.* The Seventh Circuit distinguished a law enforcement squad car—possessing microphones, video recording devices, and other electronic and recording devices, visible to its occupants—from a law enforcement squadrol, like that in *Williams*, that had no visible electronics and separated law enforcement officers from the arrestee with a solid wall that only allowed viewing, not listening, by law enforcement officers. *See id.* (distinguishing *Williams*, 15 F. Supp. 3d 821, and finding its facts inapposite). The parties describe the FBI's interview room as a closed-door room with no signage indicating that there were cameras. The Court finds that the description of the interview room is more analogous to the squadrol in *Williams* than the squad car in *Webster*.

While "courts have held that individuals do not typically have a reasonable expectation of privacy in police interview rooms," *Napper v. United States*, 22 A.3d 758, 768 (D.C. 2011), that cannot be an absolute because even "prisons are not beyond the reach of the Constitution." *Williams*, 15 F. Supp. 3d at 829 (quoting *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)). "Determining whether an expectation of privacy is 'legitimate' or 'reasonable' necessarily entails a balancing of interests," not just a declaration that you are in police custody. *Id.* at 830 (quoting *Hudson*, 468 U.S. at 527). While the Court understands that a video camera might be necessary to monitor Llufrio's safety and ensure that he did not escape from the interview room while under arrest and unattended, the Government presents no reason why it would need to record the sounds from the room other than for incriminating purposes while Llufrio sat alone. *See id.* at 829–30 ("The curtailment of certain rights in prisons is necessary to ensure the safety . . . This Court cannot imagine that the safety concerns related to handcuffed suspects in a squadrol are comparable, and the government has failed to explain what

15

interests justified an intrusion into Defendants' expectation of privacy within the squadrol." (citations omitted) (internal quotation marks omitted)); *Munn*, 56 S.W.3d at 496 (Tenn. 2001) (government failed to explain why hidden recording system provided security and outweighed privacy).

"If the police truly believe that no reasonable person would have an expectation of privacy in such a room, the recording equipment should not need to be disguised." *Williams*, 2013-Ohio-5076, 2013 WL 6081535, at ¶ 38. Indeed, luring arrestees into "a false sense of security" in a locked room with no law enforcement officers and with no visible working audio-recording device—but with a concealed recording device—suggests that, in such a room, there is a reasonable expectation of privacy. *United States v. Diaz*, No. CR 05-0167 WHA, 2006 WL 3086732, at *5 (N.D. Cal. Oct. 30, 2006). There were no signs that indicated the FBI was recording Llufrio's statements with a hidden recorder. Instead, agents left him alone in a room with the door shut. *Cf. People v. Liberg*, 486 N.E.2d 973, 978, 138 Ill. App. 3d 986, 93 Ill. Dec. 440 (1985) (finding no reasonable expectation of privacy because police officers that overheard the defendant's oral communications into telephone were right next to him in the cell and he was not in an area that afforded him any privacy). The FBI agents closed the door to the interview room and then began recording. *See Gennusa v. Shoar*, 879 F. Supp. 2d 1337, 1349 (M.D. Fla. 2012) ("Here, Marmo's actions in closing the door to the interview room when exiting and allowing plaintiffs to speak alone fostered an expectation of privacy."). The Court finds that society would recognize an expectation of privacy in the police interview room under these circumstances.

Therefore, the Court finds that Llufrio has met his burden of showing an expectation of privacy and the Court denies the Government's motion and bars the statements from trial.

## CONCLUSION

For the foregoing reasons, the Court denies the Government's motion to admit [100] and excludes Llufrio's recorded statements, spoken alone while in an FBI interrogation room.

Dated: February 15, 2017

SARA L. ELLIS
United States District Judge